UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------X
                                    :
JOHN DOE,                           :
                   Plaintiff,       :
                                    :
                                    :          11 Civ. 6182 (KBF)
        -v-                         :
                                    :          MEMORANDUM OPINION &
MAJOR MODEL MANAGEMENT INC.,        :               ORDER
KATIA SHERMAN, JASON KANNER, and    :
GUIDO DOLCI,                        :
                   Defendants.      :
                                    :
------------------------------------X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: MAR 09 2012

KATHERINE B. FORREST, District Judge:

        On September 2, 2011, plaintiff brought claims for

discrimination and retaliation under the American with

Disabilities Act ("ADA"), 42 U.S.C § 12101 et seq., and state

and city law analogues, N.Y. Exec. Law § 290 et seq., and N.Y.

City Admin. Code § 8-107, against his former employer, Major

Model Management Inc. ("Major"), his direct supervisor at Major,

Jason Kanner (who has since left Major), the President and Chief

Executive Officer of Major, Katia Sherman, and Major's owner,

Guido Dolci (collectively, "defendants"). Doe claims that

defendants failed to provide reasonable accommodation for his

disability--i.e., his diagnosis with HIV--and retaliated against

him. This Court cannot be guided by the sympathy that

plaintiff's diagnosis evokes, but rather by whether an

employer's response to that condition, under all of the facts

and circumstances in the record, demonstrates that the employer violated the law.  On the record here, the Court finds that plaintiff does not have a valid cause of action for discrimination and retaliation.

Plaintiff has proffered insufficient evidence to raise a triable issue of fact as to whether he can establish a prima facie case of discrimination or retaliation under federal, state, or city laws.  In addition, Major has proffered a legitimate, non-discriminatory reason for plaintiff's termination--namely, the elimination of plaintiff's position when defendant Kanner, the person for whom plaintiff was hired to work, abruptly left the firm, eliminating the necessity for plaintiff's position--and other positions in Major's Men's Division--entirely.

Defendants have moved pursuant to Fed. R. Civ. P. 12(b)(6) and 56 to dismiss the action or for summary judgment.  For the reasons discussed below, defendants' motion for summary judgment is GRANTED.

FACTUAL BACKGROUND

The undisputed facts set forth below are merely a summary of the purported "facts" before the Court.  Such summarization was necessary to decipher plaintiff's claims--and whether they have any merit.  This Court uses the word "summarized" intentionally:  the papers in support of and in opposition to

defendants' summary judgment motion do not distill this case to the critical elements.  In particular, plaintiff's papers contain a prolonged recitation of largely irrelevant events which have nothing to do whether defendants have engaged in actionable wrongdoing.

More importantly, neither party has submitted the required Rule 56.1 statement of undisputed facts.  See Rule 56.1, Local Civil Rules, S.D.N.Y.  Although the Court could deny defendants' motion on that basis, T.Y. v. New York City Dep't of Educ., 584 F.3d 412, 412 (2d Cir. 2009), the Court has exercised its discretion in this instance and decided to overlook both parties' failure to comply with this Court's Local Rules.  See Holtz v. Rockefeller & Co., Inc., 258 F.3d 62, 73 (2d Cir. 2001).  Instead, the Court conducted an "assiduous review of the record," id. (quotations omitted), and finds the undisputed facts to be as follows.[1]

---

[1] The Court independently reviewed the countless emails and letters (many of them duplicates) spanning from September 21, 2009 through October 2010 attached as Exhibit B to the Attorney Affidavit of Kenneth R. Maguire in Support of Defendants' Converted Rule 56(b) Motion ("Maguire Aff.") (Dkt. No. 30).  None of those emails was identified specifically for the proposition(s) they allegedly support.

In addition, the Maguire Affidavit also contains factual averments of which Mr. Maguire could not possibly have had first-hand knowledge.  (See Maguire Aff. ¶¶ 3-20.)  Accordingly, the Court does not credit those assertions-- although it need not--in rendering a decision on the instant motion.

The Court likewise does not credit the self-serving assertions in plaintiff's affidavit that have no record support.  See BellSouth Telecommc'ns, Inc. v. W.R. Grace & Co.-Conn., 77 F.3d 603, 615 (2d Cir. 1996).

Plaintiff was hired on a part-time basis by defendant Major at the beginning of September 2009.  He had a five-hour daily commute (round trip) to and from his home in Pennsylvania to New York City.  This commute was of plaintiff's own choosing.  (See Affidavit of John Doe ("Doe Aff.") (Dkt. No. 31-2) ¶¶ 6, 8; Affidavit of Katia Sherman ("Sherman Aff.") (Dkt. No. 30-7) ¶¶ 5, 6; see also Sherman Aff. ¶ 11.)  In or about the end of September 2009, Major offered plaintiff a full-time position as Kanner's assistant.  (Doe Aff. ¶ 6; Sherman Aff. ¶ 6.)  After accepting that offer (see Doe Aff. Ex. D), from September 29, 2009 through the end of December 2009, regardless of any agreement that plaintiff could arrive at work at 10:00 a.m. (see Doe Aff. ¶ 6 & Ex. D), it is uncontroverted that plaintiff frequently arrived substantially after 10:00 a.m. or did not come into the office altogether based upon problems with his commute.  (See, e.g., Attorney Aff. of Kenneth Maguire ("Maguire Aff.") (Dkt. No. 30) Ex. B (various emails from plaintiff to Kanner evidencing problems with plaintiff's train commute and stating either that he would be late or not be able to make it in at all); see also Aff. of Jason Kanner ("Kanner Aff.") (Dkt. No. 30-8) ¶ 8.)  During the September to December 2009 time period, the record shows that plaintiff made errors in the course of his work.  (See, e.g., Maguire Aff. Ex. B (Nov. 30, 2009 4:56 p.m. email from Doe to Kanner ("I apologize for

dropping the ball on that.  Is there anything I can do to amend this?")).)

On January 1, 2010, plaintiff resigned from Major, citing his desire to continue his education, his lack of financial means to move to New York, and his inability to "keep[] up [his] drive in a 'sink or swim' type atmosphere," as well as his disagreement "with the philosophy in [Major's] Men's Division," and the fact that it was "not a place" in which he saw "the potential for growth."  (Doe Aff. ¶ 8; Sherman Aff. ¶ 6; Maguire Aff. Ex. B (Jan. 1, 2010, 2:46 p.m. email from plaintiff to Sherman (SM000133)).)  Later that month, plaintiff was in contact with a Major employee, Tom Winslow (who initiated the contact is disputed, but ultimately immaterial), regarding the possibility of returning to Major for purposes of assisting with Fashion Week.  (Doe Aff. ¶ 9; Sherman Aff. ¶ 7.)  Major rehired plaintiff as of February 1, 2010 in a full-time capacity as Kanner's assistant.  (Sherman Aff. ¶¶ 7, 11.)[2]

In March 2010, plaintiff began experiencing health problems and inquired of Sherman regarding his health benefits, at which time Sherman informed him that Major was switching insurance companies and he would be provided with insurance by April.

---

[2] The October 1, 2011 letter from Major to plaintiff regarding his unpaid leave of absence states that plaintiff was hired on a part-time basis from February through March and that became a full-time salaried employee in April.  (Sherman Aff. Ex. B at 1 (SM000023).)  That discrepancy in Sherman's affidavit, however, does not change the outcome of the Court's decision.

(Doe Aff. ¶ 12.)  As of April 22, 2010, plaintiff was informed that he had full health insurance benefits from Major.  (Maguire Aff. Ex. B (Apr. 22, 2010 email exchange between plaintiff and Kanner (Kanner:  "Katia said ur [*sic*] insurance is up and running," plaintiff: "That's amazing about my insurance.  I'm making a doctor's appointment tomorrow for Saturday.")).)

On May 3, 2010, plaintiff was diagnosed with HIV and informed defendants Sherman and Kanner of the diagnosis that same day.  (Doe Aff. ¶ 16; Sherman Aff. ¶ 13; Kanner Aff. ¶ 12.) By plaintiff's own account, upon learning of his diagnosis, Sherman was "sympathetic" and told plaintiff "to take as much time as [he] needed away from work."  (Doe Aff. ¶ 16.)  On May 4, 2010, the diagnosis was confirmed.  (Doe Aff. ¶ 17.)  Upon relaying that to Sherman, he asked if Major would provide a car service "to shuttle [plaintiff's] parents to the train statement from the hospital at night, and to use for [plaintiff's] Dr's [*sic*] appointments."  Sherman agreed--and arranged for the car service for plaintiff and his family on 13 occasions.  (Doe Aff. ¶ 17; Sherman Aff. ¶ 13.)

Prior to his diagnosis, during the period from February 1, 2010 through May 4, 2010, plaintiff took a number of sick days (according to defendants' count, 11) and committed serious errors in his work (again according to defendants, six). (Sherman Aff. ¶ 12; see also, e.g., Maguire Aff Ex. B (Feb. 5,

6

2010 1:37 p.m. email from plaintiff to Kanner ("Sorry.  I fixed it."); Feb. 10, 2010 email exchange between plaintiff and Kanner (Kanner:  "not good kiddo . . . I understand but to me it's not [*sic*] given til you here [*sic*] form [*sic*] them," plaintiff: "I apologize and will take the fall for that."); Feb. 10, 2010 6:14 a.m. email exchange between plaintiff and Kanner regarding train delays and not coming into the office; Feb. 22, 2010 3:56 p.m. email exchange between plaintiff and Kanner regarding an error in plaintiff's work to which he responded, "I see, now.  I apologize."); Feb. 23, 2010 1:24 p.m. email from plaintiff to Kanner ("didn't mean to send that lightbox 'Swim Suit Shoot'"); Feb. 26, 2010 email exchange between plaintiff and Kanner re train delays and plaintiff not coming in to work given the length of the delays; Mar. 15-16, 2010 email exchange between plaintiff and Kanner re train delays and possibility of not coming in; Mar. 24, 2010 5:29 a.m. email from plaintiff to Kanner re taking a sick day.)  Notwithstanding Major's policy that its "employees are allocated five(5) sick or personal days for each calendar year of their employment" (Sherman Aff. Ex. B (SM00023); see also Reply Aff. of Katia Sherman ("Sherman Reply Aff.") (Dkt. No. 32-1) Ex. A), plaintiff was paid for a substantial portion of the sick days he took in 2010 (Sherman Reply Aff. at 4 & Ex. B; see also Sherman Aff. ¶ 13).

Subsequent to his diagnosis, plaintiff took sick leave from May 4, 2010 through June 21, 2010, during which time Major paid for a car service for plaintiff and/or his family at least 13 times. (Sherman Aff. ¶¶ 13-14; see also Doe Aff. ¶¶ 17-31; Maguire Aff. Ex. D (copies of vouchers).) During that time, Major "increased" plaintiff's health insurance "to be 100% employer paid," and paid him his full salary "for most of th[at] period." (Sherman Aff. Ex. B.) On June 21, 2010, plaintiff returned to work in his original position as Kanner's full-time assistant. (Sherman Aff. ¶ 14.)

Upon plaintiff's return to work in June 2010, "plaintiff required more income to reach the level for full health insurance and to cover his ongoing expenses," which Major accommodated by "increase[ing] plaintiff's salary so that he would qualify for full prescription drugs benefits." (Sherman Aff. ¶ 14.) In July 2010, Major gave plaintiff a $1,000 advance on his pay. (Sherman Aff. ¶ 16; Sherman Reply Aff. at 4.)

Plaintiff returned to work for some period of days between June and August 2010, during which time he again committed errors. (See, e.g., Maguire Aff. Ex. B (July 12, 2010 4:27 p.m. email from plaintiff to Kanner ("OMG. I'm sorry. I really don't make blatant mistakes like that"); July 23, 2010 email exchange between plaintiff and Kanner regarding plaintiff forgetting to change confirmations in a booking chart).)

On September 10, 2010, plaintiff committed another, this time "serious," error at work--which plaintiff concedes occurred.  (Sherman Aff. ¶ 17; Kanner Aff. ¶ 15; Doe Aff. ¶ 34; see also Maguire Aff. Ex. B (Sept. 10, 2010 email exchange re errors in booking models).)  There was an "altercation" between plaintiff and Kanner on September 10, the result of which is disputed (i.e., whether plaintiff told Kanner "to go 'F' himself" and verbally resigned from his position or was told to "get out of the office").  (Doe Aff. ¶ 41; Kanner Aff. ¶ 15; Sherman Aff. 17 & Ex. A.)  At the end of the day, Kanner sent plaintiff an email saying that he did not need to come in to work the next day, but that plaintiff would need to meet with Sherman and himself the following Monday.  (Doe Aff. ¶ 34; Maguire Aff. Ex. B (Sept. 10, 2010 6:25 p.m. email).)

At the September 13, 2010 meeting among plaintiff, Sherman and Kanner, Kanner asked, "Where do we go from here?," at which time, plaintiff asked to take temporary disability.  (Doe Aff. ¶ 35.)  Sherman explained that if that was the route plaintiff wished to take, a more favorable financial option would be being a "firing" in which plaintiff was given a "generous severance" and could collect unemployment since temporary disability would not be financially advantageous, but would be able to return to Major upon regaining his health.  (Id.)  After various back and forth, Kanner offered plaintiff a "deal" in which plaintiff

would be paid his fully salary from September 20, 2010 to
January 1, 2011 with health benefits extending until March 2011.
(Doe Aff. ¶ 38.)  On September 23, 2011, plaintiff called Kanner
and agreed to "take the deal," as long as he would be able to
return to Major once he was well.  (Doe Aff. ¶ 40.)

On September 24, defendant Sherman emailed plaintiff a
letter dated September 23, accepting plaintiff's resignation,
but offering him an opportunity to return to work for Kanner
"should [he] wish to come back to work immediately."  (Doe Aff.
¶ 41 & Ex. K; Sherman Aff. Ex. A.)  On September 24, plaintiff
indicated to Kanner that he would be returning to work on
Monday, September 27.  (Doe Aff. ¶ 42 & Ex. L; see also Sherman
Aff. ¶ 19.)  Sherman sent a follow-up email on September 24 to
plaintiff stating that she would see him at 10:00 a.m. on
Monday, September 27, to discuss "hours/divisions and so on,"
and assured him not to worry.  (Doe Aff. Ex. N.)

On September 26, plaintiff emailed Sherman to let her know
that he had become ill and would be unable to return to work on
September 27.  (Doe Aff. ¶ 43 & Ex. M; Sherman Aff. ¶ 19.)
Sherman responded:  "Get well and keep me posted."  (Doe Aff.
Ex. O.)  Two days later Sherman requested that plaintiff call
John Sherman (in Major's legal department), at a time convenient
for plaintiff.  (Doe Aff. Ex. R.)  On September 29, John Sherman
initiated a call to plaintiff in which John Sherman informed

plaintiff that Major would pay him his full salary for six weeks commencing on October 4, 2010, that his health insurance coverage would remain through the end of the 2010 calendar year, and that he could take an unpaid leave of absence during which he could claim disability or return to work if permitted by his doctor. (Doe Aff. ¶ 48; Sherman Aff. Ex. B.)

Sherman sent a letter to plaintiff memorializing their September 29 conversation. (Sherman Aff. Ex. B; Doe Aff. ¶ 49.) Plaintiff responded to the email, "I appreciate you thinking of me, as I have received the attached letter. I will meet with my doctor tomorrow . . . as [*sic*] we shall determine the length of time for my absence." (Doe Aff. Ex. R.) Plaintiff did not dispute any of the facts of his employment at Major laid out in the October 1 letter upon receipt. (See id.) On October 7, plaintiff informed Major that his doctor expected him to be able to "medically return to work in six weeks." (Doe Aff. ¶ 50 & Ex. U.)

On October 27, 2010, plaintiff's supervisor, Kanner, left Major--with Major's "understanding and consent"--to start a competing agency, and took a substantial portion of Major's business with him. (Sherman Aff. ¶ 22; Kanner Aff. ¶ 20.) Plaintiff, whose only position at Major had been as Kanner's

assistant,[3] no longer had a position after Kanner left the firm--
i.e., plaintiff's "position had essentially evaporated."
(Sherman Aff. ¶ 23.)

The next day, Sherman sent plaintiff a letter on Major's
behalf notifying him of Kanner's departure and that as a result
of the "reorganization and downsizing," "several positions,
including [his], ha[d] been eliminated."  (Doe Aff. Ex. V; see
also Sherman Aff. ¶ 24.)[4]  The letter reiterated that Major
understood that the "news may come at a bad time," that they
"wish[ed] [they] were not in this position," but that "during
these difficult economic times [they] ha[d] little recourse."
(Doe Aff. Ex. V.)  Major, however, stated that despite the
elimination of plaintiff's position, the "accommodations set
forth in our letter to you dated October 1, 2010 concerning a
gratis compensation package and health insurance coverage during
your unpaid leave of absence will remain in effect as
outlined"--i.e., plaintiff would continue to be paid his full

---

[3] Plaintiff asserts that he worked as a junior booker from February 19, 2009
through his diagnosis in May as a junior booker who was not only supervised
by Kanner, but also by Tom Winslow, another Major employee.  (Doe Aff.
¶ 11.)  There is nothing in the record to support that assertion--the
uncontroverted evidence shows that plaintiff worked exclusively for Kanner
during his time at Major, although had contact with other employees--and the
Sherman Reply Affidavit directly contradicts that assertion (see Sherman
Reply Aff. at 5).  Further, subsequent to his diagnosis, there is no dispute
that plaintiff worked exclusively for Kanner.

[4] Plaintiff also emailed a copy of the letter on November 2, 2010, with a text
of the email reading, "You probably already know that Jason and Andrew left
Major."  (Doe Aff. Ex. W at 3.)

Plaintiff's assertion that Major had made three new hires since October 1,
2010 (Doe Aff. ¶ 52) is completely without support in the record.

salary through November 15, 2010, and would retain health insurance through the end of 2010.  (Id.; Sherman Aff. ¶ 24.)

On November 2, 2010, plaintiff responded to the letter sent via email that same day stating that he was "confused as to why [his] specific position had been eliminated," but thanked Sherman "for my time of employment and for everything you've assisted me with," and asked if he could use Sherman "as a reference for future employment opportunities." (Doe Aff. Ex. W.)

PROCEDURAL HISTORY

On November 22, 2011, defendants notified plaintiff that they intended to move to dismiss this case under Fed. R. Civ. P. 12(b)(6) or 56.  (Maguire Aff. Ex. E.)  Defendants filed the instant Rule 56 motion on December 16, 2011 (see Dkt. No. 19), and the motion was fully briefed as of January 20, 2012 (see Dkt. Nos. 31, 32).

Although plaintiff has asserted that the motion is premature because discovery has yet to occur, he has not sought specific discovery prior to responding to this motion, has not made a motion pursuant to Rule 56(f) of the Federal Rules of Civil Procedure, and has even failed to set forth any particular discovery that he would take if provided an opportunity to do so.  Accordingly, his argument as to prematurity fails.  See Di Benedetto v. Pan Am World Serv., Inc., 359 F.3d 627, 630 (2d

13

Cir. 2004) ("The failure to file an affidavit under Rule 56(f) is itself sufficient grounds to reject a claim that the opportunity for discovery was inadequate." (quotation marks and alterations omitted)).

DISCUSSION

I.   STANDARD OF REVIEW

Summary judgment may not be granted unless all of the submissions taken together "show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).  The moving party bears the burden of demonstrating "the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  In making that determination, the court must "construe all evidence in the light most favorable to the nonmoving party, drawing all inferences and resolving all ambiguities in its favor." Dickerson v. Napolitano, 604 F.3d 732, 740 (2d Cir. 2010).

Once the moving party has asserted facts showing that the non-movant's claims cannot be sustained, the opposing party must "set out specific facts showing a genuine issue for trial," and cannot "rely merely on allegations or denials" contained in the pleadings.  Fed. R. Civ. P. 56(e); see also Wright v. Goord, 554 F.3d 255, 266 (2d Cir. 2009).  "A party may not rely on mere speculation or conjecture as to the true nature of the facts to

14

overcome a motion for summary judgment," as "[m]ere conclusory allegations or denials cannot by themselves create a genuine issue of material fact where none would otherwise exist." Hicks v. Baines, 593 F.3d 159, 166 (2d Cir. 2010) (citation omitted). In addition, self-serving affidavits, sitting alone, are insufficient to create a triable issue of fact and defeat a motion for summary judgment. See BellSouth Telecommc'ns, Inc. v. W.R. Grace & Co.-Conn., 77 F.3d 603, 615 (2d Cir. 1996). Only disputes over material facts--i.e., "facts that might affect the outcome of the suit under the governing law"--will properly preclude the entry of summary judgment. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); see also Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986) (stating that the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts").

II.   THE ADA CLAIM

     Plaintiff has brought both discrimination and retaliation claims under the ADA, 42 U.S.C. §§ 12112(a), 12203(a). (Compl. ¶¶ 98-103.)  The ADA makes it unlawful for an employer, with respect to hiring or discharge, to "discriminate against a qualified individual with a disability because of the disability of such individual."  42 U.S.C. § 12112(a).  In addition, the ADA prohibits employers from retaliating against an individual

15

for "oppos[ing] any act or practice made unlawful" by the ADA. 42 U.S.C. § 12203(a).  The ADA applies to employers: it does not confer individual liability.  Spiegel v. Schulmann, 604 F.3d 72, 79 (2d Cir. 2010).  For that reason, the claims against the individual defendants here--i.e., Sherman, Kanner, and Dolci-- must be dismissed with prejudice.  Id.  However, the Court still must consider whether plaintiff has made out an ADA claim against Major.

A.   Discrimination Under the ADA

To establish a prima facie discrimination claim under the ADA, Doe must establish sufficient facts showing that:  (a) he is disabled within the meaning of the Act (this is not a point in dispute here); (b) Major is subject to the ADA and had notice of his disability (also not a point of contention); (c) he was otherwise qualified to perform the essential functions of his position, with or without reasonable accommodation; and (d) he was fired because of his disability.  See Reeves v. Johnson Controls World Servs., Inc., 140 F.3d 144, 149-50 (2d Cir. 1998).

Assuming plaintiff can make out a prima facie case (and this Court does not find that plaintiff here can), the burden would shift to Major under the analysis of McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-03, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), to show a legitimate, nondiscriminatory purpose for

its allegedly adverse action (i.e., plaintiff's firing).  See Raytheon Co. v. Hernandez, 540 U.S. 44, 49-50 (2003); Reg'l Econ. Cmty. Action Program, Inc. v. City of Middletown, 294 F.3d 35, 48-49 (2d Cir. 2002).

Here, plaintiff fails to (i) raise triable issues with respect to the third and fourth elements of the prima facie case, and (ii) rebut the legitimate, non-discriminatory rationale proffered by Major for plaintiff October 2011 termination.

i.   Prima Facie Case

Plaintiff has not offered sufficient evidence to create a triable issue of fact regarding whether he was qualified to perform his position with or without reasonable accommodation, or that he was fired because of his diagnosis with HIV.

First, the amount of leave that plaintiff took, starting prior to his diagnosis with HIV (the 11 days prior to May 4, 2010), the six weeks of leave he took between May and mid-June 2010, the leave he had to take unexpectedly in September 2010 through what would have been sometime in November 2010, combined with his admitted errors in job performance, meant that he was not an "individual with a disability who, with or without reasonable accommodation" could perform the "essential functions of the employment position."  42 U.S.C. § 12111(8).

Courts have found that requested leave was unreasonable as a matter of law when absences were so erratic that the employer literally could not know from one day to the next whether the employee would be returning to work.  See Waggoner v. Olin Corp., 169 F.3d 481 (7th Cir. 1999).  That is precisely the situation here.  Plaintiff missed several days of work (not even those due to his disability, but also to his own choice of residence), six weeks between May and June 2010, and additional unexpected leave commencing on a day he said he would be at work in September 2010 which was to continue likely into mid-November 2010.  Those absences and the manner in which they occurred (e.g., erratically) are not disputed in the record.  Such absenteeism is sufficient to find that plaintiff was unable to perform the essential functions of his job.  See, e.g., Rios v. Dep't of Educ., 351 Fed. Appx. 503, 505 (2d Cir. 2009) (affirming the district court's grant of summary judgment for the defendant because plaintiff "was unable to demonstrate that she was 'otherwise qualified' within the meaning of the ADA because she could not perform the 'essential function' of regularly showing up to work"); Vandenbroek v. PSEG Power, CT LLC, 365 Fed. Appx. 457, 459-60 (2d Cir. 2009) (plaintiff was not able to show that he was "otherwise qualified" because "reliable attendance at shifts was an essential function" of his job).  Even if Major had terminated plaintiff for his

absenteeism (and as discussed below, they did not), plaintiff's future unpredictability in showing up for work is sufficient reason to conclude that plaintiff could not perform the essential functions of his job. See Teahan v. Metro-North Commuter R.R. Co., 80 F.3d 50, 55 (2d Cir. 1996) (affirming the district court's finding that the plaintiff was not "otherwise qualified" because his employer could have concluded that he posed a recurring risk of absenteeism). Plaintiff has failed to meet his burden in showing that he was "otherwise qualified" to meet the essential requirements of his job with Major. See Borkowski v. Valley Central Sch. Dist., 63 F.3d 131, 138 (2d Cir. 1995).

Absences aside, plaintiff experienced problems in actually performing the essential functions of his job period. Plaintiff does not dispute that he made errors in the performance of his duties at Major. Instead, he essentially asks the Court to overlook those errors because others at Major made the same or similar errors (although there is no support in the record, other than plaintiff's assertion, for that fact). (Cf. Doe Aff. ¶ 38.) In any event, that assertion does not raise a triable issue of fact as to whether plaintiff himself was able to perform the essential functions of his job.

Correctly booking models for Fashion Week, correctly conveying information to models about the time of their

19

bookings, correctly posting information about models to Major's website presumably are all core functions of an assistant's job at a modeling agency.  The undisputed facts recited above demonstrate that plaintiff committed errors in performing all of those job functions, as well as others.  A number of errors occurred prior to plaintiff's diagnosis with HIV, and thus, add further support to the Court's conclusion that plaintiff was unable to perform the essential functions of his job at all-- even with the reasonable accommodations made for him by Major (i.e., allowing him to keep his job despite errors and lateness or absenteeism).  Even so, Major provided plaintiff a number of "free passes" in which they allowed him to continue in his role despite those mistakes, including a purportedly "serious" one on September 10, 2010 related to Fashion Week.  That in and of itself demonstrates that defendants provided reasonable accommodation to plaintiff.

Second, plaintiff likewise fails on proving that he was fired because of his diagnosis with HIV.  Plaintiff's claim is that while his position was eliminated through a circumstance that Major could not control--i.e., Kanner's departure, they should nonetheless have continued to employ him and should be held liable for significant damages for failing to do so.  That type of accommodation exceeds the law's definition of "reasonable."  Cf. Fink v. New York City Dep't of Personnel, 53

F.3d 565, 567 (2d Cir. 1995) (finding that a reasonable accommodation "does not require the employer to provide every accommodation the disabled employee may request, so long as the accommodation is reasonable").  The record is devoid of any indication that plaintiff was fired for any reason other than that Kanner's departure eliminated his position at Major as Kanner's assistant.

The only thing that plaintiff sets forth regarding his firing are a number of self-serving assertions that, even construed entirely in plaintiff's favor, fail to show (or even suggest) that he was fired based upon his disability.  Plaintiff asserts that, during his negotiations for how he could remain financially secure and with full insurance benefits albeit with a reduced work schedule or on full leave, he began to suspect on September 20, 2010 that Kanner did not want him to work for him any longer.  (See Doe Aff. ¶ 38.)[5]  In addition, plaintiff proffers uncorroborated hearsay that John Sherman told him that Kanner no longer wanted plaintiff to work for him.  (Id. ¶ 48.)  Even crediting those assertions as true, nothing about them indicates that Kanner did not want plaintiff to work for him based on his diagnosis with HIV.  A more plausible explanation is that after plaintiff made a "serious" mistake on September 10

---

[5] Plaintiff later contradicts that assertion when he states that Kanner told him on September 24, 2010 that Kanner would continue to speak to plaintiff despite Sherman's purported request to the contrary.  (Doe Aff. ¶ 41.)

after which he and Kanner had an "altercation," Kanner did not want to work with plaintiff based upon the fallout from that altercation.

Plaintiff's further self-serving assertions that Sherman herself exhibited a "very emotional" or angry demeanor towards plaintiff, refused to speak to him for a 40-minute period of time, or made rash statements in what had clearly become a tense situation (see Doe Aff. ¶¶ 37-38) are insufficient to show that he was terminated because of his diagnosis with HIV.  As discussed below, the legitimate, non-discriminatory purpose proffered by defendants--i.e., the elimination of his position upon Kanner's departure--provides a more plausible explanation for plaintiff's termination.

Accordingly, plaintiff has failed to meet his burden of demonstrating a prima facie case of discriminatory under the ADA.

ii.  Legitimate, Non-Discriminatory Reason

Even if plaintiff could establish a prima facie case (and as discussed above, he cannot), plaintiff fails to rebut the uncontroverted evidence of defendants' legitimate, non-discriminatory reason for plaintiff's termination.

The event that resulted in the elimination of plaintiff's position occurred through no fault of Major's or Sherman's.  It is undisputed that his position with Major was to function as

Kanner's assistant; it is also undisputed that Kanner abruptly left Major in late October 2010, taking a significant portion of Major's male model business with him.  In other words, Major no longer needed to have an assistant for Kanner, because Kanner was no longer with Major.  Nothing presented by plaintiff rebuts defendants' legitimate, non-discriminatory reasons for his termination.  That in itself is sufficient grounds on which to grant summary judgment.

It may be that plaintiff would have preferred to have been placed in a new position at Major, but there is no legal requirement that as part of reasonable accommodation under the ADA, Major create a new position for him at a now smaller firm, once his own position was eliminated.  Cf. Fink, 53 F.3d at 567. Indeed, there is undisputed evidence that as a result of Kanner's departure Major eliminated other positions in addition to plaintiff's.  (Sherman Aff. ¶ 23.)

There is no doubt that based on the chronology of events, Kanner's departure from Major followed a period of months when plaintiff and defendants had been dealing with plaintiff's absences and discussing a period of disability leave or termination that might provide plaintiff with financial resources along with a period of health coverage.  But there is no evidence in the record of any causal link between those discussions and Kanner's departure from Major.

Defendants have proffered a legitimate, non-discriminatory reason for plaintiff's termination which stands unrebutted in the record.  Thus, even if plaintiff could establish a <u>prima</u> <u>facie</u> case, he has not offered sufficient evidence to create a triable issue of fact regarding whether he terminated <u>because</u> he was diagnosed with HIV.

Accordingly, this Court grants defendants' motion for summary judgment on plaintiff's ADA discrimination claim.

B. <u>Retaliation Claim</u>

To establish a <u>prima</u> <u>facie</u> case of retaliation, a plaintiff must show that:  (i) he engaged in a protected activity; (ii) defendant was aware of that activity; (iii) he suffered an adverse employment action; and (iv) there was a causal connection between that protected activity and the adverse employment action.  <u>Distasio v. Perkin Elmer Corp.</u>, 157 F.3d 55, 66 (2d Cir. 1998).  <u>McDonnell Douglas</u> burden-shifting likewise applies to retaliation claims under the ADA.  <u>Terry v. Ashcroft</u>, 335 F.3d 128, 141 (2d Cir. 2003).

To compare the elements of a <u>prima</u> <u>facie</u> retaliation case with the undisputed facts recited above forecloses this claim before it can even begin.  Plaintiff has not made any claim whatsoever--and has not asserted any facts that lead this Court to believe--that plaintiff engaged in any protected activity. Filing this action--which occurred nearly ten months after the

elimination of plaintiff's position as Kanner's assistant and
nearly eight months after plaintiff stopped receiving gratis
health care benefits from Major--is the most the Court could
construe as a protected activity.  Stating the timing of that
action shows the absurdity of construing it as a protected
activity in an ADA retaliation context.  That aside, the record
is notably devoid of <u>any</u> facts supporting any elements of a
<u>prima facie</u> retaliation claim under the ADA.  For that reason,
the Court grants defendants summary judgment on the ADA
retaliation claim as well.

III.    THE STATE AND CITY LAW CLAIMS

        Plaintiff has also asserted claims under the New York State
Human Rights Law, N.Y. Exec. Law § 290 <u>et seq.</u>, and the New York
City Human Rights Law, N.Y. City Admin. Code § 8-107, against
all defendants for discrimination and retaliation on the basis
of disability.  (<u>See</u> Compl. ¶¶ 75-97.)  Because claims under
those state and city statutes are subject to <u>McDonnell Douglas</u>
burden shifting, and because, as discussed above, defendants
have offered a legitimate, non-discriminatory basis for
plaintiff's termination which plaintiff has failed to rebut, the
Court finds that defendants are entitled to summary judgment on
those claims as well.  <u>See Fall v. N.Y. St. United Teachers</u>, 289

Fed. Appx. 419, 422 (2d Cir. 2008); Sista v. CDC Ixis N. Am.,
Inc., 445 F.3d 161, 169 n.2 (2d Cir. 2006).[6]

CONCLUSION

For the aforementioned reasons, the Court finds that
plaintiff has failed to raise a genuine issue of material fact
on his discrimination and retaliation claims under federal,
state, or city law.

Accordingly, defendants' motion for summary judgment is
GRANTED and this case is dismissed.

The Clerk of Court is directed to enter judgment for
defendants.

The Clerk of the Court is further directed to terminate the
motion (Dkt. No. 19) and to terminate this action.

SO ORDERED:

Dated: New York, New York
       March 9 , 2012

K— B. Forrear

KATHERINE B. FORREST
United States District Judge

---

[6] Because this Court has determined that all claims fail as a matter of law,
it need not reach the other questions raised by defendants.